## 54567. MACE v. THE STATE.

QUILLIAN, Presiding Judge.
This is an appeal from a conviction for conspiracy to commit rape. Brenda Shepherd and Becky Tomblin lived together in a house, half-way between Perry and Warner Robins. On Monday, July 19, 1976, Miss Shepherd was going home and as she passed a truck full of hay two black men "were trying to stop [her]. . ." Shortly afterwards the same two men came to the door of their home and asked to use their phone saying they had run out of gas. The girls refused to admit them but called the phone number given them. There was no answer. One of the men asked if the girls lived there alone. Miss Shepherd told him Mr.

Harvey lived there also. The "slender guy," the defendant, said Harvey "sure had a good looking old lady, and that I sure looked good and that he sure would like to have some of that . . ." Miss Shepherd became "scared" and called the sheriff and her boyfriend, Mr. Harvey. The officer who responded to the call knew the defendant and the other man and took them to the home of Mr. Sims — where they worked. Approximately 30 minutes later the two men returned, but Mr. Harvey had arrived and went out to talk to the men. They would not get out of the truck and later left.

The following Wednesday morning, July 21, the same two men were seen outside the bedroom window of Miss Shepherd. They said their tractor needed water. Miss Shepherd told them to get it and leave. The men departed.

Mr. William Haslam also worked for Mr. Sims and he stated that sometime "about the 19th or 20th" of July, he and the defendant and the other men were unloading hay and "[t]hey told [him] they were going back, and, you know, going back and get the girl." "I told them not to do it . . . they wouldn't listen at [sic] me."

Mr. Harvey and Brenda Shepherd returned to the house at approximately 9 p.m., Sunday evening, July 25, and he saw "a man running into my headlights and cut across the front of the yard." All that he could tell was "that he was a black man, rather slender . . .[He] was in the general stature of one of the men that had been there that week." They tried to phone the sheriff but the phone was dead. They drove to the next house and called the sheriff. After they returned they examined the outside phone box and saw that the wires had been removed.

The investigating officer asked another police officer to "pick up" the defendant and bring him to the girls' home. After the defendant arrived the investigator advised the defendant of his "Miranda rights" by reading them from a card that he carried. He asked the defendant if he had any part "in breaking the phone lines?" ". . . [H]e admitted that he and Jeff Whitehurst had broken the phone lines and that they were going to break in, or going to enter the house." The defendant was taken to police headquarters, advised of his rights again, signed a waiver

of counsel form, and discussed the offense. He had been advised both times that he was suspected of the offense of "criminal damage to property." After the second interrogation, the defendant was again interrogated the following morning and the charge was changed to "conspiracy to commit rape." The last statement of the defendant was tape-recorded and played to the jury.

Although the tape was played to the jury it was not recorded for the transcript and this court has been deprived of the use of this evidence. It could have been a critical matter causing us to return the transcript for a correct record of what transpired in court. However, questioning by counsel, quoting from a transcript of this tape has apprised us of a sufficient portion of the contents that we can accomplish this appellate review. Apparently neither side thought the omission to be of significant importance to require the record to be supplemented.

Questioning by the defense counsel of the investigator produced this portion of the missing tape: "Q. But you really weren't satisfied with your response, with his responses, so then you say here, putting words into his mouth, 'But the only reason you didn't rape the girls was because those cars scared you off, right?" And then he gives his response, 'We were going to ask them; we were going to ask her first.' And then you say, 'But if she hadn't let you, you were going to go ahead and do it anyway, right? Is that right?' And then they say, 'Yes, sir.' "

Defendant appeals his conviction. *Held:*

1. Enumeration of the general grounds as error is without merit. There is sufficient evidence of record to establish a corpus for the offense charged, and the defendant's statements — in conjunction with the remaining evidence established the scheme of the conspirators, the corrupt agreement, intent, and the overt act — the breaking of the telephone wires, before they were deterred by outside intervention. See Code Ann. § 26-3201 (CCG § 26-3201; Ga. L. 1968, pp. 1249, 1335; 1969, pp. 857, 867; 1977, p. 601).

2. Defendant claims there was no valid waiver of the right of counsel, that he indicated a desire to speak to an attorney, that his reading ability was limited, he was nervous and scared, and incapable of knowingly and

intelligently waiving his constitutional rights. Further, it is contended the defendant was illegally arrested without a warrant and was not taken before a magistrate until 6 p.m., Monday evening, July 26.

The fact that defendant's statements were made prior to the issuance of a warrant, or formal charge made, or that the defendant was not immediately carried before a magistrate authorized to issue a warrant within the time prescribed would not render such statements inadmissible. *Smith v. State,* 218 Ga. 216, 228 (126 SE2d 789); *Pistor v. State,* 219 Ga. 161, 165 (132 SE2d 183).

Legality, duration, and conditions of detention are relevant matters for consideration and determination of whether defendant's statement is voluntary, but nothing has appeared of record to require this court to find, "as a matter of law," that this detention — even if illegal, rendered defendant's statement coerced and involuntary, therefore inadmissible. *Wilson v. State,* 229 Ga. 395, 397 (191 SE2d 783). See also United States v. Watson, 423 U.S. 411 (1) (96 SC 820, 46 LE2d 598). The trial judge and jury were authorized to determine from the circumstances that these statements were voluntary and admissible. *Smith v. State,* 218 Ga. 216, 228, supra; *Wilson v. State,* 229 Ga. 395, 398, supra. "Factual and credibility determinations of this sort made by a trial judge after a suppression hearing must be accepted by appellate courts unless such determinations are clearly erroneous." *Johnson v. State,* 233 Ga. 58 (209 SE2d 629).

Further, the court was authorized to find that the defendant had been fully advised of all of his Miranda rights, and was a person of average intelligence, and that he voluntarily, knowingly, and intelligently waived his right to counsel. *Royal v. Faircloth,* 226 Ga. 65, 66 (172 SE2d 410).

3. Defendant's fourth enumeration of error, states: "The Court erred in replaying to the jury the tape recorded statement of Appellant which was admitted in evidence." His brief now argues that the tape-recorded statement "was not admitted in evidence." Defendant will not be permitted to change the nature or basis of the error stated in his enumeration. *Mayes v. Hodges,* 142 Ga. App. 538 (1a) (236 SE2d 494). In any event the defendant did not

object when the tape recording was first played or when the jury requested that it be replayed. He may not raise such objection now as a basis for an appeal. *Pulliam v. State,* 236 Ga. 460, 465 (224 SE2d 8).

*Judgment affirmed. Shulman and Banke, JJ., concur.*

SUBMITTED OCTOBER 11, 1977 — DECIDED JANUARY 9, 1978.

*James J. Daly, Jr.,* for appellant.
*Stephen Pace, Jr., District Attorney,* for appellee.

*Judgment affirmed. Shulman and Banke, JJ., concur.*